Filed 5/30/23  P. v. Pree CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>              v.<br><br>WILLIAM PREE et al.,<br><br>    Defendants and Appellants. | A152028<br><br>(Contra Costa County Super. Ct. No. 51520378) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>              v.<br><br>WILLIAM PREE,<br><br>    Defendant and Appellant. | A160554<br><br>(Contra Costa County Super. Ct. No. 51520378) |

Following a jury trial, defendants William Pree and Edward Clifford Robinson were convicted of the murder of Kartiae Ely, unlawful firearm possession, and gang and other enhancements. The trial court imposed lengthy prison sentences.

In these consolidated appeals, the defendants (with each one joining many of the other's arguments) contend (1) their murder convictions are invalid, in part because of recent legislation, (2) the court made erroneous rulings pertaining to jury selection, third party culpability evidence, and

1

discovery, (3) the court erroneously denied Pree's motion to suppress evidence obtained from his cell phone, (4) the firearm possession charge against Robinson was unsupported by sufficient evidence and was based on erroneous jury instructions, (5) the gang enhancements are invalid due to recent legislative changes and are based on inadmissible evidence, and (6) the sentences contain multiple errors and, separately, must be revisited in light of recent legislation.

The Attorney General concedes that, because of recent legislative enactments, Pree's murder conviction and the gang enhancements for both defendants must be reversed. The Attorney General also agrees the defendants must be resentenced. But the Attorney General opposes most of the defendants' remaining contentions and argues Robinson's murder conviction as well as both defendants' firearm possession convictions should be affirmed.

We agree with the Attorney General's concessions. We also conclude Robinson's murder conviction must be reversed due to recent legislative changes. Because we are reversing both defendants' murder convictions, their other challenges to the validity of those convictions are moot. We reject the defendants' arguments that are directed either to the validity of their firearm possession convictions or to the validity of all their convictions generally. We therefore affirm in part and reverse in part.

## I. BACKGROUND

Ely was fatally shot in the early evening of September 6, 2015, in the driveway of an apartment complex on Cavallo Road in Antioch. The prosecution argued that Robinson was the shooter and that Pree drove Robinson away from the scene.

### A. *The Evidence Presented at Trial*
### 1. Prior Shooting at the Apartment Complex

The parties stipulated that on June 17, 2015, an armed robbery and double homicide occurred outside the apartment complex. A group of people, including Pree and his fiancée, were gathered in the area. A masked man, later determined to be Clydesdale "Cheese" Hoskins, Jr., approached the group and ordered everyone onto the ground at gunpoint. Hoskins began to rob the group, firing shots in the process. During the robbery, Pree's fiancée was shot and killed. Hoskins was also killed during the incident. Police arrested three people in connection with the robbery and homicides. Pree was determined to be a victim and was never a suspect in the incident. There was no evidence Ely or any witness in this case was present or involved in the June 2015 incident.

Shortly after the June 2015 homicide at the complex, there was graffiti on a nearby liquor store that said, "RIP Cheese." The liquor store was a known hangout for a gang called the Broad Day Killers (BDK). Antioch police officers learned that "Cheese" (aka Hoskins) was associated with BDK.

Brittany Scott, Ely's girlfriend, testified that about a month prior to the shooting, Ely had lost his job and sometimes sold marijuana. She believed that Ely was on Cavallo Road about once a week.

At some point before September 6, 2015, Scott went to Cavallo Road with Ely. They spoke with Pree and another person. Pree asked Ely if he had anything to do with the shooting involving "Cheese." Ely said that some people did not like him so they were "putting stuff on his name." Pree told Ely that they were going to have a barbecue, and Ely could come over and tell everyone that he had nothing to do with the incident with Cheese.

## 2. The Shooting of Ely

On September 6, 2015, a group of people, including Taquan Hailey, Jalen "Bo" Ward, Traevon Watt, Alison Bynum, and Twonesha Wood, were at the apartment complex at 1824 Cavallo Road. They were having a barbecue for Wood's birthday weekend. They started hanging out and drinking around 10:00 a.m.

Ward saw Ely and Kawan "Man-Man" come by the apartments about an hour and a half before the shooting. Ward testified that Ely would come to the area "every now and then." Ward spoke to Ely two or three days before the murder.

About 30 minutes before the shooting, Ward saw Ely walk to Romi's liquor store, which was on a nearby corner. Ward saw Robinson at the liquor store along with Hardy and Ely. Ward met Robinson about a week before the shooting. Robinson had introduced himself as "OG Blood."

At the time of the shooting, Ward was in the bathroom near the carport at the apartment complex and heard Ely say, "Bro, you tellin' these niggas that you got a problem with me?" Ward said, "[N]ah," and "Where'd you get that from?"

Ward then heard a gunshot, turned around, and saw Ely on the ground. Robinson was standing over him with a Glock firearm. Ward had seen Pree in the back of the apartment complex on the day of the shooting. Ward knew Pree because he had accompanied him three or four times to Freeman "Freejack" Williams's house in Vallejo to record music.

Hailey testified that he was at the complex on the day of the shooting, delivering clothes to Ward. As he was waiting outside, he saw Robinson and Ely walking toward the apartment complex from Romi's liquor store. Hailey recognized Ely because he had previously seen him in the area. As Robinson and Ely entered the driveway of the complex, Robinson pushed Ely in front of

4

him, drew a pistol, and shot Ely in the back of the head.  Right before the shooting, Hailey heard Ely say, "Bo, I thought we were cool."  Hailey told the police that he heard Ward say, "We is."

According to Hailey, at the time of the shooting, Pree's Cadillac was parked in the driveway, facing out toward the street.  Pree was in the car and it was running.  Hailey told the police that, before the shooting, he had seen Pree and Robinson arrive together at the apartment complex in Pree's Cadillac.

Alison Bynum testified that she had frequently seen Ely in the area of the Cavallo apartment complex.  That area was a "drug block," but she minded her own business.  At the time of the shooting, she was outside on the stairs on one side of the building.  When she heard the shot, she thought it was fireworks.  She looked over the balcony and saw Ely's body on the ground.  Bynum saw Robinson in the area that day, but she did not see him after the shooting.  Bynum had met Pree a few months earlier, and she had seen him around frequently.  She had gone with him once to a music studio in Vallejo.  She believed Pree drove a black car, and it could have been a Cadillac.  In an interview with an inspector for the district attorney's office, Bynum stated that Pree sold drugs in the area and that he was at Cavallo on the day of the murder, driving his black Cadillac.

Twonesha Wood, Alison Bynum's girlfriend, was hanging out with Bynum, Ward, and Hailey on a landing at the apartment building.  She heard a pop, and everybody "scattered."  She saw Ely's body in the driveway before she ran away.  An hour or two prior to the shooting, Wood saw a car backed into the parking lot playing music.  She saw several "older cats" by the car holding guns.  One of the men put a "rifle" or "machine gun" in the trunk of the car.

When interviewed by the police four days after the shooting, Wood said "OG" and "Will" were involved in the shooting. Wood stated that before the shooting she saw OG and Will near Will's car at the Cavallo apartments. She said OG had an assault rifle or "chopper" and Will had a pistol. In a later interview, she clarified that Will had the assault rifle and OG had the pistol.

A neighbor who lived across the street from the Cavallo apartments was in his kitchen when he heard one gunshot. He looked outside and saw a heavy-set Black man running toward a Cadillac CTS. The car was backed into the driveway facing out. The man got into the passenger side of the car. He then got out and appeared to pick up something off the ground before getting back into the car. The car "took off like a bat outta hell." The neighbor also saw other people ("at least more than ten") running from the scene. The Cadillac was tan or gold with dealership plates.

### 3. The Investigation

Police officers arrived at the scene and found Ely's body in the driveway of the apartment complex. Based on the blood pools, it appeared Ely's body had been dragged after he was shot. An officer looked through Ely's pockets for identification and found four baggies of what he believed to be cocaine that was packaged for sale.

Police found a nine-millimeter cartridge casing at the scene. The firing pin impression on the casing was consistent with being fired from a Glock handgun. The words " 'Fuck Cheese' " were written on the driveway.

Ely's cause of death was a single, perforating gunshot wound to the neck and head. The bullet entered the back of his head and neck and exited through his mouth. The gun was more than 18 inches away from Ely's head when the shot was fired. The downward trajectory of the wound was consistent with a shooter approximately six feet tall, standing on a hill at a point slightly higher than where the victim stood. There were abrasions on

6

Ely's elbows that were consistent with falling due to the gunshot, but were also consistent with being dragged once on the ground. There was marijuana in Ely's system when he was killed.

Detective James Colley interviewed Jalen Ward after the shooting. Ward was initially a suspect in the shooting. Ward said "OG Blood" was the shooter. Ward showed Colley his cell phone contact information for OG Blood. Colley determined the cell phone number was registered to Robinson. He compiled a photographic lineup, and Ward identified Robinson as the shooter.

On September 8, 2015, Detective Colley received information that Robinson was in Vallejo. Colley initiated a "ping" on Robinson's phone, which showed he was at 106 Fieldstone Way in Vallejo. Colley contacted the U.S. Marshals to assist in surveilling the address. Special Agent Baron Earl saw Robinson leave 106 Fieldstone and get into the back seat of a Cadillac. Pree was the driver of the Cadillac, and a woman was in the front passenger seat.

Earl followed the vehicle and eventually, with the assistance of San Pablo police officers, stopped the car. All the occupants were handcuffed and pat searched. Robinson was arrested and transported to the police station. Two cell phones were seized and later given to Detective Colley, and the Cadillac was impounded. At that time, Pree was not a suspect in the murder, and he was released at the scene.

Also on September 8, officers served a search warrant at 106 Fieldstone. Freeman Williams was in the house. Officers found a .40-caliber Glock 22 semiautomatic pistol on an end table next to a couch. In a hall closet, officers found an empty 30-round magazine for an AR-15 rifle. In the master bedroom, under the bed, officers found an AR-15 rifle with a 30-round magazine containing .223-caliber bullets. There were also two

7

boxes of .380-caliber bullets under the bed. Each box was for 50 rounds; one was full and one had 49 rounds.

At some point, Pree called Detective Colley asking for the return of his cell phone and his car. When he picked up his phone and car, he told Detective Colley he sometimes stayed at 106 Fieldstone in Vallejo, sometimes stayed with his mother in Antioch, and sometimes stayed with his "baby mother."

On September 10, Detective Colley returned to the crime scene and found a bullet slug on the level part of the driveway between 1824 and 1820 Cavallo Road. Detective Colley also interviewed Wood and Hailey on September 10.

On September 21, Detective Colley reinterviewed Hailey. Hailey identified Pree and Robinson in photographic lineups. Hailey stated that Robinson shot Ely.

On September 28, Detective Colley arrested Pree.

**4. Cell Phone Evidence**

The police obtained data from the two phones seized during the car stop—one of which belonged to Robinson, and one to Pree—as well as a phone belonging to Traevon Watt.

Pree's phone had several photos of guns, including one that looked similar to the AR-15 recovered during the search of 106 Fieldstone. Another photo was of a handgun that looked similar to the handgun seized during that search. Freeman Williams was in some of the photos on Pree's phone. There were also photos of marijuana, money, and people flashing the hand sign for the number 4. One photo showed a gun pointed at a block of cheese.

Several videos on Pree's phone were played for the jury. In two of the videos, taken a few days before the shooting, Pree was walking from

8

1824 Cavallo in the direction of Romi's liquor store. Pree stated he was armed and that he was going to take over the block and make money there.

Pree's phone contained text messages about sales of narcotics, specifically marijuana and pills like Norco or Xanax. There were also text messages related to selling guns. There were text messages about giving "OG" money. About 40 minutes after the shooting, there was a text message from Pree to Williams that said "Hit ASAP." There were also text messages between Robinson and Pree.

On Robinson's phone, late in the evening on the date of the shooting, there was a text from Robinson to Williams sending an article about the shooting.

Cell site information obtained from the records for Pree's and Robinson's phones showed both phones were using a cell tower near 1824 Cavallo Road in the early evening on September 6, 2015, the date of the shooting. Both phones later used cell towers near the Fieldstone house—Pree's later in the evening on the day of the shooting; Robinson's the following evening.

### 5. Gang Evidence

Sergeant Richard Cavagnolo testified as an expert on gangs, including the Kumi African Nation, or Kumi. Detective James Stenger testified as an expert in East Contra Costa County gangs.

Sergeant Cavagnolo testified that Kumi is a prison gang that is an umbrella gang for members of street gangs when they enter the prison system. Kumi symbols include "415," "4," and the hand sign "4." Common terms that are used between Kumi members are "[l]oved one" (or "LO"), "bleeding heart," " 'folks' " (which stands for "for our love, knowledge, and salvation"), "rap artists," "K," and "DAE, the alphabetical acronym for 415." Kumi's motto is " 'forever forever.' " Cavagnolo testified that the primary

9

activities of Kumi include murder, attempted murder, possession of firearms, robbery, narcotics trafficking, and shooting at inhabited dwellings or cars.

Cavagnolo testified about "gang guns." He testified that gangs have guns to defend themselves against their rivals. Gangs often use a portion of the money they make selling drugs or committing other crimes to purchase " 'gang guns.' " Cavagnolo testified members of the gang have "access to a gun at all times." Gang guns are often stashed in "safe house[s]," places controlled by the gang where a gang member can hang out, use drugs, or get guns.

There was evidence Freeman Williams, who lived in the Fieldstone house, was a high-ranking Kumi member, and that Robinson and Pree were also members. Robinson had admitted he was a member, including telling a corrections officer, " 'Read my file. I'm a Kumi motherfucker.' " Pree had a tattoo on his arm that said " 'Kumi warrior,' " and he had associated with known Kumi members while in prison.

According to Detective Stenger, the Broad Day Killers (BDK) were a street gang operating in Antioch. The leader of BDK at the time of the murder was Kawan Hardy. Ely was a good friend of Hardy and was affiliated with BDK. Ely's brother was a member of BDK.

Detective Stenger had investigated narcotics dealing and shootings on Cavallo Road in Antioch. In September 2015, Detective Stenger believed there was a power struggle on Cavallo between BDK and the people who were hanging out in the 1800 block of Cavallo. Stenger opined that Kumi members were attempting to go into the Cavallo area and start selling drugs. Stenger believed that the videos of Pree stating that he was going to take over the block meant that he was taking over a territory to sell drugs. Stenger stated that Kumi members have meetings, and he found it

significant that a meeting discussed between Robinson and another Kumi member, Roosevelt McCoy, was to be at Pree's residence on the day of the murder.

In answer to a hypothetical question based on the facts of the present case, Detective Stenger opined the murder was committed in association with and benefitted Kumi, because it showed the gang would kill someone who crossed it. In answer to the same question, Sergeant Cavagnolo believed the crime benefitted the gang. He based his opinion in part on Pree's earlier comments about taking over the block, the fact there were "two Kumi members there, one driving, one doing the shooting," and the fact that they retreated to a house belonging to a high-ranking Kumi member.

### 6. Robinson's Defense Case

Robinson's defense was that someone else, most likely Jalen Ward, killed Ely, and the other witnesses were mistaken or lying about seeing Robinson shoot Ely.

Dakota Ward (who was 15 years old at the time of trial) and his mother, Tanya Ward,[1] were in their apartment in the complex at the time of the shooting. Before the shooting, Dakota saw five or six people running to the street from apartment No. 3. The people ranged in age from 17 to 23. Dakota heard screaming and fighting, and he then heard a gunshot. After the gunshot, three of the people ran back to apartment No. 3. Jalen Ward was one of the people running back to apartment No. 3. Dakota told the police that Jalen Ward was the last person near Ely after the shot. Dakota did not see who fired the shot.

---

[1] The Attorney General states in his brief that neither witness was related to Jalen Ward. For clarity, we refer to Dakota and Tanya by their first names.

11

Before the shooting, Tanya saw five or six people walk past her apartment door toward the parking area and then toward the street. Seconds before the gunshot, Tanya heard an argument outside. After the gunshot, the people started running, some back to apartment No. 3, and she heard a car leaving the parking lot with its tires squealing.

Celia Hartnett, an expert in crime scene reconstruction, testified that she was unable to identify with certainty where the shooter was standing at the time of the murder because there was no evidence of where the bullet landed after exiting Ely's mouth. Hartnett provided a diagram of the likely area where the shooter was standing. The area was inconsistent with Hailey's testimony as to the location of the shooter.

### 7. Pree's Defense Case

Michelle Wakefield, the ex-girlfriend of Freeman Williams, lived with him at the house in Vallejo and was present when the search warrant was served on September 8. Wakefield knew "Will" as Williams's cousin. Wakefield never saw Pree with drugs except marijuana. She never saw Pree and Williams exchange money. She never saw Pree with any guns. The marijuana plants found during the search belonged to her. The garage at the house was used as a recording studio.

Pree's mother also testified that Freeman Williams is Pree's cousin.

### 8. Rebuttal

Officer Gary Lowther spoke with Wakefield during the service of the search warrant at the Vallejo house. She referred to Robinson as "Blood" and stated that he had "creepy eyes." She said she had seen Robinson before the day of the murder. She saw a bag that she associated with Robinson. She believed she saw the end of a large, black gun sticking out of the bag. Wakefield told Lowther that Robinson was at the address a day or two after the murder and his demeanor was "weird."

## B. *Procedural Background*

An information filed in November 2015 charged Robinson and Pree with murder (Pen. Code,[2] § 187, subd. (a); count 1) and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2). For both counts, the information alleged the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)). As to the count 1 murder charge, the information alleged a principal personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm causing death (§ 12022.53, subds. (b)–(e)). The information alleged each defendant had a prior conviction that qualified as both a serious felony conviction (§ 667, subd. (a)(1)) and a strike (§§ 667, subds. (b)–(j), 1170.12).

In March 2017, the jury returned its verdicts, finding Robinson guilty of first degree murder and possession of a firearm by a felon. The jury found the gang enhancement allegations true as to both counts. The jury found the personal discharge of a firearm enhancement allegation on count 1 not true.

The jury found Pree guilty of second degree murder and possession of a firearm by a felon. The jury found the gang enhancement allegations on both counts true and the personal discharge of a firearm enhancement allegation not true.

In April 2017, the court (Hon. Diana Becton) found the prior conviction allegations for each defendant to be true.

At sentencing in July 2017, the court (Judge Becton) sentenced Robinson to an aggregate term of 64 years to life. The court sentenced Pree to an aggregate term of 44 years to life.

---

[2] Undesignated statutory references are to the Penal Code.

13

Pree and Robinson appealed their judgments of conviction (initiating appeal No. A152028).

While the appeals in No. A152028 were pending, this court stayed the appellate proceedings to allow defendants to file petitions for resentencing under former section 1170.95 (now section 1172.6) in the superior court. In June 2019, Pree filed a petition for resentencing. Robinson did not.

In June 2020, the superior court (Hon. Charles Burch) denied Pree's petition. Pree appealed (initiating appeal No. A160554).

In July 2021, we granted Pree's application to consolidate the two appeals.[3]

## II. DISCUSSION

### A. *Pree's Second Degree Murder Conviction Must Be Reversed*

Pree contends, and the Attorney General concedes, that in light of recent legislation revising the law of murder, the jury instructions at trial were erroneous and were prejudicial as to Pree, requiring reversal of his second degree murder conviction. The parties rely on Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which took effect on January 1, 2019, and Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775), effective January 1, 2022. We agree that Pree may seek relief under these enactments in his direct appeal from the judgment of conviction and that they require reversal. We also agree with the parties that Pree's appeal of the trial court's order denying his resentencing petition should be dismissed.

---

[3] In addition to these pending appeals, Robinson has filed in this court a petition for a writ of habeas corpus (No. A164864). We address that petition in a separate order filed concurrently with this opinion.

14

## 1. Senate Bill 1437

Senate Bill 1437 " 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)" (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).)

As our Supreme Court explained in *Gentile*, Senate Bill 1437 furthered that purpose by adding three provisions to the Penal Code:

"First, to amend the felony-murder rule, Senate Bill 1437 added section 189, subdivision (e): 'A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.' Because [Pree and Robinson were] not prosecuted under a theory of felony murder, this provision is not at issue here. (§ 189, subd. (a).)

"Second, to amend the natural and probable consequences doctrine, Senate Bill 1437 added section 188, subdivision (a)(3) . . . : 'Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime.'

15

"Third, Senate Bill 1437 added [former] section 1170.95 to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief under the two ameliorative provisions above." (*Gentile, supra*, 10 Cal.5th at pp. 842–843.)[4]

Specifically, as to the third change noted by the *Gentile* court, under section 1172.6 (former section 1170.95), the convicted person "may file a petition with the court that sentenced the petitioner to have the petitioner's . . . conviction vacated and to be resentenced on any remaining counts" when certain conditions apply. (§ 1172.6, subd. (a).)

**2. Senate Bill 775**

Effective January 1, 2022, Senate Bill 775 "amended [former] section 1170.95 [(now section 1172.6)] in several respects, including (1) clarifying that, in some circumstances, the same relief available to persons convicted of murder is also available to persons convicted of attempted murder or manslaughter ([§ 1172.6], subd. (a); Stats. 2021, ch. 551, §§ 1, subd. (a), 2) and (2) addressing various aspects of the petition procedure, including the petitioner's right to counsel, the standard for determining the existence of a prima facie case, the burden of proof at the hearing to determine whether a petitioner is entitled to relief, and the evidence a court may consider at that hearing ([§ 1172.6], subds. (b)–(d); Stats. 2021, ch. 551, §§ 1, subds. (b)–(d), 2)." (*People v. Birdsall* (2022) 77 Cal.App.5th 859, 865, fn. omitted.)

"Significantly for the present case, Senate Bill 775 amended [former] section 1170.95 [(now section 1172.6)] to provide that a person with a

---

[4] Assembly Bill No. 200 (2021–2022 Reg. Sess.) has since renumbered section 1170.95 as section 1172.6, effective June 30, 2022. (Stats. 2022, ch. 58, § 10.)

qualifying conviction that is *not final* may challenge the validity of that conviction *on direct appeal* based on Senate Bill 1437's changes to the murder statutes. ([§ 1172.6], subd. (g); Stats. 2021, ch. 551, § 2.) [Section 1172.6], subdivision (g) states: 'A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437 . . . .' A defendant whose conviction is not final is not required to use the petition procedure set forth in [section 1172.6] to seek Senate Bill 1437 relief, but may instead raise the Senate Bill 1437 claim on direct appeal." (*People v. Birdsall, supra*, 77 Cal.App.5th at pp. 865–866.)

When Pree filed his opening brief in the direct appeal from the judgment of conviction, Senate Bill 1437 had taken effect, but Senate Bill 775 had not yet been enacted. In his opening brief, Pree argued his murder conviction was invalid under Senate Bill 1437 because it was based on the natural and probable consequences doctrine. He contended it was appropriate to raise that argument on direct appeal and that reversal was required, asserting in part that the jury instructions at trial were defective because they allowed conviction under the natural and probable consequences doctrine. Pree alternatively asked this court (both in his opening brief and in a separate motion) to stay the appeal to permit him to file a petition for relief under former section 1170.95. Finally, Pree argued in his brief that the evidence was insufficient to support his murder conviction on a natural and probable consequences theory.

As noted, this court stayed the direct appeal; Pree filed a petition under former section 1170.95; the trial court denied his petition; and Pree appealed the denial order.

As a result of these proceedings, this court has before it both Pree's direct-appeal challenge based on Senate Bill 1437 and his challenge to the resentencing petition denial. And because Pree's murder conviction is not yet final, he may raise his Senate Bill 1437 claim on direct appeal. (See *People v. Vieira* (2005) 35 Cal.4th 264, 305–306 [conviction is not final while direct appeal is pending].)

### 3. The Court's Instructions on Murder and the Erroneous Instruction on Liability for Acts of Coconspirators

The trial court instructed the jury on murder with malice aforethought (CALCRIM No. 520) and first degree murder based on premeditation and deliberation (CALCRIM No. 521). The court also instructed on principles governing the liability of both aiders and abettors and coconspirators.

As to aiding and abetting, the court instructed on general principles of aiding and abetting (CALCRIM No. 400) and the liability of a direct aider and abettor for an intended crime (CALCRIM No. 401). The court did *not* instruct on the natural and probable consequences doctrine as an aspect of aiding and abetting liability (CALCRIM Nos. 402 and 403), i.e., the jury was not told it could convict a defendant of murder as a "nontarget offense" if it was the natural and probable consequence of an intended "target offense" that he aided and abetted (see *Gentile, supra*, 10 Cal.5th at p. 843 [summarizing the two forms of liability for aiders and abettors—"direct aiding and abetting" and "the natural and probable consequences doctrine"]).

As to conspiracy, however, the court *did* instruct on a theory that would allow conviction of murder if it was an unintended crime that resulted from an agreement to commit a different crime. Specifically, the court instructed on the theory that Pree and Robinson participated in an uncharged conspiracy to sell, possess, or transport narcotics (CALCRIM No. 416), and that, as coconspirators, they were guilty of murder if (1) a member of the

18

conspiracy committed murder to further the conspiracy and (2) the murder was a natural and probable consequence of the common plan or design of the conspiracy (CALCRIM No. 417).[5]

Pree and the Attorney General agree that, in light of Senate Bill 1437's changes to the law of murder, the court's instruction on liability for acts of coconspirators (CALCRIM No. 417) was erroneous and presented the jury with what is now an invalid basis for a murder conviction. We agree. The instruction, by authorizing a conviction of murder as the natural and

[5] The court's instruction on this point, based on CALCRIM No. 417 ("Liability for Coconspirators' Acts"), stated in part: "A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime.

"A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy *if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy.* This rule applies even if the act was not intended as part of the original plan. Under this rule, a defendant who is a member of the conspiracy does not need to be present at the time of the act.

"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

"A member of a conspiracy is not criminally responsible for the act of another member if that act does not further the common plan or is not a natural and probable consequence of the common plan.

"To prove that the defendant is guilty of [murder as charged in Count 1], the People must prove that: [¶] 1. The defendant conspired to commit one of the following crimes: [Health and Safety Code sections] 11359, marijuana sales and/or 11378, possession of controlled substance and/or 11379, transportation of a controlled substance for sale. [¶] 2. A member of the conspiracy committed murder to further the conspiracy; [¶] AND [¶] 3. *[M]urder was a natural and probable consequence[] of the common plan or design of the crime that the defendant conspired to commit.*" (Italics added.)

probable consequence of the uncharged drug conspiracy, allowed the jury to find Pree guilty of murder without finding he acted with malice, a result no longer permitted after Senate Bill 1437. (§ 188, subd. (a)(3) ["Except [for felony-murder liability], in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime."]; *Gentile, supra*, 10 Cal.5th at pp. 838–839, 843, 851 [in case involving aiding and abetting liability, court held Senate Bill 1437 bars a conviction for second degree murder under the natural and probable consequences doctrine]; *People v. Offley* (2020) 48 Cal.App.5th 588, 599 [defendant was potentially eligible for relief under Senate Bill 1437 where murder conviction could have been based on theory that victim's death was natural and probable consequence of conspiracy].)[6]

### 4. The Error Was Prejudicial as to Pree

When a trial court instructs on a legally erroneous theory of guilt, a reviewing court "normally assess[es] whether the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24.

---

[6] For purposes of the instructional error here (allowing conviction of murder without proof of malice), the liability of a *conspirator* for a crime that is the natural and probable consequence of the common design of the conspiracy is analogous to the liability of an *aider and abettor* for a nontarget crime that is the natural and probable consequence of an intended target crime. (See *People v. Rivera* (2015) 234 Cal.App.4th 1350, 1356 (*Rivera*) [under *People v. Chiu* (2014) 59 Cal.4th 155, 158–159 (*Chiu*), an aider and abettor cannot be convicted of first degree murder under a natural and probable consequences theory; Court of Appeal held a *conspirator* also cannot be convicted of first degree murder under that theory, and stated that, "[i]n these contexts, the operation of the natural and probable consequences doctrines is analogous"].) We note, however, as did the *Rivera* court, that there are some distinctions between the two theories of liability. (*Rivera*, at p. 1356, fn. 5; see *People v. Smith* (2014) 60 Cal.4th 603, 616–617.)

[Citation.]  We 'must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[] the error was harmless beyond a reasonable doubt.' " (*Gentile, supra*, 10 Cal.5th at p. 851.)  The *Chapman* standard applies both to "alternative-theory error" (i.e., instruction on multiple theories of guilt, one of which is legally erroneous) and to other errors involving the omission or misdescription of elements of a charged offense.  (*People v. Aledamat* (2019) 8 Cal.5th 1, 3, 9 (*Aledamat*);  accord, *In re Lopez* (2023) 14 Cal.5th 562, 580 (*Lopez*); *In re Ferrell* (2023) 14 Cal.5th 593, 602 (*Ferrell*).)

Applying *Chapman* here, we agree with the parties that the instructional error was prejudicial as to Pree, requiring reversal of his murder conviction.  The verdict form for Pree shows the jury adopted the now-invalid theory that he was guilty of murder as the natural and probable consequence of the uncharged drug conspiracy.  The form first asked the jurors to state whether they found Pree not guilty or guilty of murder, and they found him "guilty."  The form then stated:

"If you have found the defendant guilty above based upon an uncharged conspiracy theory, *please proceed to Findings 1A, 2[, and] 3 and ignore finding 1.*

"If you have found the defendant guilty above based upon an aiding and abetting theory, please proceed to Findings 1, 2[, and] 3 and ignore finding 1A.

"If you have found the defendant not guilty above, please sign and date this form."  (Original italics removed; italics added.)

The jurors *disregarded Finding 1* (leaving blank a space where they would have stated whether it was "true" or "not true" that "the murder was willful, deliberate, and premeditated")  and proceeded to Finding 1A, where

21

they found Pree conspired to (1) possess marijuana for sales, (2) possess Norco for sales, and (3) transport Norco for sales.[7]

In light of the directions on the form, the jury's decision to disregard Finding 1 and to complete Finding 1A reflects that it found Pree guilty of murder "based upon an uncharged conspiracy theory," i.e., the theory submitted in the jury instructions that (1) he participated in an uncharged drug conspiracy, and (2) he was guilty of murder because a member of the conspiracy committed a murder that was a natural and probable consequence of the conspiracy. And the form does not include any findings showing the jury also adopted the still-valid theory presented by the jury instructions that Pree was guilty because he directly aided and abetted a perpetrator who committed murder.[8] We see no other basis on this record (and neither party has suggested one) to find the instructional error harmless.[9] We will therefore reverse Pree's murder conviction.

---

[7] In findings that are not relevant to the prejudice question presented here, the jury also completed Finding 2 (stating it was "not true" that Pree personally and intentionally discharged a firearm) and Finding 3 (stating it was "true" that Pree committed the offense in association with a criminal street gang).

[8] Although conceding the instructional error here was prejudicial as to Pree, the Attorney General notes in passing that the trial court, when it ruled on Pree's resentencing petition, stated that the verdict form was "confusing" and that there "is nothing specific in the completed verdict forms when read together with the jury instructions that demonstrates that the jury's conviction of [Pree] for murder rested solely" on the natural and probable consequences theory. Without delving into this question, we conclude, for the reasons discussed in the text, that (1) the jurors adopted the natural and probable consequences theory, and (2) it is at best unclear whether they were also persuaded by the direct aiding and abetting theory.

[9] In particular, neither the verdict nor the evidence allows us to conclude that "any rational jury would have found [Pree] guilty based on a

## 5. Pree's Appeal of the Order Denying His Resentencing Petition Will Be Dismissed

The Attorney General contends that, because Pree has elected to pursue his Senate Bill 1437 claim in his direct appeal from the judgment of conviction, he cannot also proceed with his appeal of the trial court's order denying his resentencing petition under former section 1170.95 (now section 1172.6). The Attorney General argues the appeal of the resentencing denial should be dismissed. In his reply brief, Pree agrees that, because his murder conviction will be reversed in the direct appeal, his appeal of the denial of his resentencing petition is moot.

We agree with the parties that dismissal is appropriate here. In light of our conclusion that Pree's murder conviction must be reversed in the direct appeal, we need not address whether the trial court erred in rejecting Pree's challenge to that same conviction in his resentencing petition. We will dismiss Pree's appeal of the order denying the petition.[10]

## 6. Sufficiency of the Evidence

In his opening brief in the direct appeal from the judgment of conviction, Pree contended (as an alternative to his Senate Bill 1437 arguments) that there was insufficient evidence to support his conviction of murder as the natural and probable consequence of an uncharged drug conspiracy. Specifically, he argued the evidence did not show he conspired

---

valid theory [i.e., direct aiding and abetting] if the jury had been properly instructed." (*Lopez, supra*, 14 Cal.5th at p. 584.)

[10] Because we dismiss on the ground stated in the text, we need not address the Attorney General's broader suggestion that a direct appeal raising a Senate Bill 1437 claim and an appeal from the denial of a resentencing petition "cannot proceed" together in any circumstances because they "yield different and conflicting remedies if the appellate court finds prejudicial error in one or both appeals."

with Robinson to commit the drug offenses that were alleged to be the objects of the uncharged conspiracy. Pree did not claim the evidence was insufficient to support any other theory of murder liability, such as the theory that he directly aided and abetted Robinson's commission of murder.

The Attorney General argues that, because instructional error requires reversal of Pree's murder conviction, his claim of evidentiary insufficiency to support the now-invalid natural and probable consequences theory is "not cognizable." The Attorney General also contends the prosecution is entitled to retry Pree on the charge of second degree murder if it can do so in good faith based on a valid legal theory. In his reply brief, Pree agrees the reversal for instructional error "effectively moots" his challenge to the sufficiency of the evidence, and he does not dispute that retrial on a valid theory is permitted.

We agree with the parties. We need not determine whether sufficient evidence supports the now-invalid theory challenged by Pree. And retrial on a valid theory is permitted in these circumstances. "When there has been a postconviction change in the statutory or decisional law that invalidates a theory upon which the conviction was based and reversal is warranted, appellate courts remand the case to the trial court to allow the prosecution to retry the defendant on a legally valid theory." (*People v. Hola* (2022) 77 Cal.App.5th 362, 371.) Accordingly, "while [Pree] is entitled to have his second degree murder conviction reversed in this appeal based on the enactment of [former] section 1170.95, subdivision (g) in Senate Bill 775, the prosecution is entitled to retry him on that charge if it can in good faith

24

advance a valid legal theory to support the conviction." (*Id.* at pp. 376–377, italics omitted).[11]

### B. *Robinson's First Degree Murder Conviction Must Be Reversed*

In his initial briefing, Robinson contended his first degree murder conviction should be reversed because, under the facts and jury instructions presented, he "could be guilty of no more than second degree murder." Robinson stated the prosecutor advanced several theories in support of a first degree murder conviction, each of which was defective. In a supplemental brief, Robinson argues that, under Senate Bill 1437 and Senate Bill 775, he is "entitled to a reversal of his murder conviction, not just a reduction to second-degree murder."[12] We agree. We conclude that, in light of the new legislation, Robinson's first degree murder conviction must be reversed.

### 1. The Jury Instructions and the Prosecutor's Arguments

As noted, the court instructed on (1) murder with malice aforethought (CALCRIM No. 520) and first degree murder based on premeditation and deliberation (CALCRIM No. 521), (2) aiding and abetting, including general principles (CALCRIM No. 400) and direct aiding and abetting of intended crimes (CALCRIM No. 401), but *not* the natural and probable consequences

---

[11] The parties agree Pree's conviction (reflected in a verdict form in which the jury made no finding the murder was premeditated) was for second degree murder, and the Attorney General does not suggest that on remand Pree may be tried for first degree murder. (Similarly, in its order denying Pree's resentencing petition, the trial court noted the jurors "left blank" the portion of the verdict form that allowed them to find " 'true' or 'not true' that the murder was willful, deliberate, and premeditated," and the court agreed with the parties that Pree was acquitted of first degree murder and convicted of second degree murder.)

[12] Robinson does not contend there is insufficient evidence to support his murder conviction.

doctrine as an aspect of aiding and abetting liability (CALCRIM Nos. 402 and 403), and (3) the now-invalid theory that the defendants were guilty of murder as the natural and probable consequence of an uncharged drug conspiracy (CALCRIM Nos. 416 and 417).

In his closing argument, the prosecutor discussed the theories of liability for murder, focusing first on the liability of a perpetrator who commits a crime and a direct aider and abettor who knowingly assists the commission of the crime. The prosecutor argued that Robinson shot Ely and that Pree assisted, in part by driving him away before the police arrived. The prosecutor addressed the need to prove malice as an element of murder and premeditation to establish first degree murder. He argued the shooting of Ely involved express malice (intent to kill) and premeditation, with the latter element shown by evidence the killing was planned, the manner in which Ely was killed (an "[e]xecution-style" shot in the back of his head), the personal and gang-related motives for the killing, the "stag[ing]" of Pree's car for a quick getaway, the "callous dragging" of Ely's body to allow the defendants to leave, and the text to Freeman Williams stating Ely had been killed.

The prosecutor argued that, "[u]nder the aiding and abetting theory" (i.e., where "one is the shooter, and the other is the aider and abettor"), both Robinson and Pree were guilty of first degree murder. The prosecutor stated: "And all Mr. Pree has to do is provide any type of aid or assistance with knowledge of the unlawful purpose. And if you determine they are both perpetrators which is functionally, in this case, the same as determining that one is the shooter, and the other is the aider and abettor, they are both guilty of first-degree murder, and all enhancements."

As to the theory of liability based on an uncharged drug conspiracy, the prosecutor described the elements of a conspiracy, and then addressed "the

26

natural and probable consequence doctrine." The prosecutor argued that, based on witness testimony about gang activity, violence (including murder) was a foreseeable consequence of drug sales because "there have been violent takeovers of turf when people are selling drugs, especially, when they're engaged in gang conduct." The prosecutor stated: "And all of that is what shows that when you have people that are engaged in drug sales, especially when they're engaged in drug sales for Kumi, who are known to carry weapons. Who possess them as gang guns, that it is highly likely that somebody can die."

The prosecutor then stated that, if the jury concluded the murder was a natural and probable consequence of the conspiracy, "what that does is Mr. Pree is guilty of second-degree murder and the gang enhancement, and Mr. Robinson is guilty of first-degree murder and all the enhancements." The prosecutor later reiterated: "If conspiracy is found by you, as to Mr. Robinson, he's guilty of first-degree murder and all the enhancements. [¶] If it is conspiracy only as to Mr. Pree, then it's determined, and you would make that determination foreseeable in a drug sales conspiracy that someone might be killed, even if Mr. Pree doesn't know who it's going to be, he would be guilty of second-degree murder."[13]

_____

[13] As Robinson emphasizes, on one interpretation of these remarks (that they were describing the scope of Robinson's liability *as a non-shooter* under the natural and probable consequences doctrine), the statements were inaccurate under *Chiu* and *Rivera,* which limited liability in this context to second degree murder. (*Chiu, supra,* 59 Cal.4th at pp. 158–159, 166; *Rivera, supra,* 234 Cal.App.4th at pp. 1356–1357, 1359.) But it is not clear that is what the prosecutor meant. It appears possible that the prosecutor (who consistently argued Robinson was the shooter) was contrasting the aiding and abetting and conspiracy theories as they affected the scope of *Pree's* liability as a non-shooter.

27

## 2. The Jury's Verdict

The jury found Robinson guilty of the first degree murder of Ely. They first found him guilty of murder, and then, pursuant to the directions on the verdict form ("If you have found the defendant guilty above, please proceed to Findings") (italics omitted),[14] the jury made a "true" finding (in Finding 1) that "the murder was willful, deliberate, and premeditated." (See § 189, subd. (a) ["All murder that is perpetrated . . . by any . . . kind of willful, deliberate, and premeditated killing . . . is murder of the first degree."].)

Also for the count 1 murder charge, the jury found (in Finding 2) that it was "not true" that Robinson "personally and intentionally discharged a firearm, a handgun" under section 12022.53, subds. (d) and (e)(1). And in the verdict form for count 2, the jury found Robinson guilty of unlawful firearm possession by a felon (§ 29800, subd. (a)(1)). In additional findings on that

The prosecutor stated that, "[u]nder the aiding and abetting theory" (i.e., the prosecutor's view that Robinson was the shooter and Pree aided and abetted the murder), both defendants would be guilty of first degree murder. In contrast, in the conspiracy scenario, Robinson would still be guilty of first degree murder, but Pree, as the non-shooter, would be guilty of second degree murder. In any event, any misstatement by the prosecutor as to the scope of the now-invalid natural and probable consequences theory of murder liability is not significant here. Instructing the jury on that theory (whether or not the prosecutor described it correctly) was error, and, as we shall explain, we conclude the error was prejudicial and requires reversal under the harmless-error analysis outlined by our Supreme Court in *Aledamat*.

[14] In contrast to Pree's verdict form, the one for Robinson did not include instructions telling the jurors to complete different sets of findings depending on the theory on which they based their finding of guilt. But we do not agree with the Attorney General's suggestion that Robinson's verdict form therefore "did not give the jury the option of convicting Robinson on the invalid natural and probable consequences theory." In our view, the form, by asking generally whether the jurors found Robinson guilty or not guilty of murder, allowed them to rely on any theory that was set forth in the instructions, including the natural and probable consequences theory.

form, the jurors found Robinson possessed an assault rifle, but they did not find he possessed a handgun. The form stated: "We all agree that [Robinson] possessed a firearm on or about:

"9/1/15–9/6/15—handgun 'Glock' ": The jury stated, "No."

"9/1/15–9/6/15—Assault Style Rifle 'AR' ": The jury stated, "Yes."[15]

### 3. Analysis

Robinson argues that the court's instructions, taken together with the prosecutor's arguments, allowed the jury to convict him of first degree murder based on the natural and probable consequences doctrine, and the record does not show the jury adopted an alternative, valid theory of guilt. As the Attorney General acknowledges (and as we outlined in pt. II.A.3., *ante*), there was instructional error here. The court's instruction on liability for the acts of coconspirators (CALCRIM No. 417), which allowed conviction of murder as the natural and probable consequence of an uncharged drug conspiracy (without proof of malice) is contrary to section 188 as revised by Senate Bill 1437. The instruction permitted the jury to convict either or both of the defendants of murder on what is now an invalid theory of guilt.

We conclude that, as to Robinson (like Pree), this error was prejudicial, i.e., it was not harmless beyond a reasonable doubt. (*Aledamat*, *supra*, 8 Cal.5th at pp. 3, 9.) In its recent decision in *Lopez*, our Supreme Court, applying the *Aledamat* standard, outlined the framework for determining whether alternative-theory error is prejudicial. " ' "Sometimes it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory." ' ([*Aledamat*, *supra*, 8 Cal.5th] at p. 8.) But where, as here, the jury's verdict does not necessarily allow for

---

[15] As to both counts, the jury found the offense was committed in association with a criminal street gang (§ 186.22, subd. (b)).

29

such a determination, a court may look to 'the entire cause, including the evidence.' (*Id.* at p. 13.) 'The reviewing court examines what the jury necessarily did find and asks whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well.' (*Id.* at p. 15.) In other words, if ' "[n]o reasonable jury that made all of these findings could have failed to find" ' the facts necessary to support a valid theory, the alternative-theory error was harmless. (*Ibid.*) Indications that the jury considered an invalid theory, without more, do not undermine that conclusion." (*Lopez, supra,* 14 Cal.5th at p. 592; accord, *Ferrell, supra,* 14 Cal.5th at pp. 602-603.)

As noted, the jury found Robinson guilty of murder and found the murder was willful, deliberate, and premeditated. The Attorney General argues this finding of premeditation, taken together with the "overwhelming" evidence that Robinson was the "actual killer," establishes that the jury found Robinson guilty of murder, and specifically of first degree murder, on a theory that remains valid under current law. (§§ 188, subd. (a)(1) [express malice established by proof of intent to kill], 189, subd. (a) [willful, deliberate, and premeditated killing is first degree murder].)

We disagree. First, the jury's finding that the murder was "willful, deliberate, and premeditated" does not, itself, establish " ' "that the jury necessarily found the defendant guilty on a proper theory" ' " (*Lopez, supra,* 14 Cal.5th at p. 592), i.e., one of the valid theories presented by the court's instructions here—that Robinson (acting with the appropriate mental state) either shot Ely or directly aided and abetted the killing.[16]

---

[16] Like a perpetrator, a direct aider and abettor may validly be convicted of first degree premeditated murder under current law. (*Gentile, supra,* 10 Cal.5th at p. 848 [Senate Bill 1437 does not eliminate direct aiding

As to the theory that Robinson was the actual killer, the jury's finding of willfulness and premeditation encompasses certain mental state elements (see CALCRIM Nos. 520 & 521) but does not encompass the requirement that "[t]he defendant committed an act that caused the death of another person" (CALCRIM No. 520). (See *Ferrell, supra,* 14 Cal.5th at p. 604 [addressing whether a jury finding on an enhancement encompassed both the "physical component" and the "mental component" of the valid murder theory at issue there]; *Lopez, supra,* 14 Cal.5th at pp. 579-580 ["For a defendant to be liable as an actual perpetrator, the prosecution must prove that the defendant unlawfully killed a human being, or a fetus, with malice aforethought. (§ 187, subd. (a).)"].) Indeed, as we discuss further below, the verdict reflects that the jury was not persuaded beyond a reasonable doubt that Robinson shot Ely.

The premeditation finding also does not establish all elements of the direct aiding and abetting theory. (See *Lopez, supra,* 14 Cal.5th at pp. 586-587 [jury's apparent finding of intent to kill did not demonstrate harmlessness; "[I]ntent to kill is only one of the elements required to prove direct aiding and abetting. It does not, itself, show the jury necessarily found Lopez guilty on a proper theory."]; see *id.* at p. 587 [direct aiding and abetting liability for first degree murder requires proof the defendant " 'aided or

---

and abetting liability for murder]; *Chiu, supra,* 59 Cal.4th at p. 166 ["Aiders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles."]; *id.* at p. 167 ["An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder."].) And as noted, the court instructed on direct aiding and abetting principles (CALCRIM Nos. 400 and 401) as well as malice and premeditation (CALCRIM Nos. 520 and 521).

31

encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission' "].)[17]

Since the premeditation finding (on its own) does not establish that the jury adopted a valid theory of murder liability, we next consider whether, in light of that finding and the evidence in the case, a reasonable jury could have failed to find the remaining facts necessary to convict Robinson on a valid theory. (*Lopez, supra,* 14 Cal.5th at p. 592 [" 'The reviewing court examines what the jury necessarily did find and asks whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well.' [Citation.] In other words, if ' "[n]o reasonable jury that made all of these findings could have failed to find" ' the facts necessary to support a valid theory, the alternative-theory error was harmless."].)

Applying this "exacting" prejudice standard here (*Lopez, supra,* 14 Cal.5th at p. 581), we are unable to conclude the instructional error was harmless beyond a reasonable doubt. In our view, it would have been possible for a reasonable jury to (1) find the murder was willful, deliberate, and premeditated, but (2) *fail to find* the remaining facts necessary to establish a valid theory, such as that Robinson shot Ely or committed acts directly aiding or encouraging the killing with knowledge of the perpetrator's

---

[17] The relevant instruction on direct aiding and abetting, CALCRIM No. 401, which was given here, states in part: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime."

intent (while perhaps concluding Robinson did commit acts connected with the uncharged drug conspiracy).

Illustrating this possibility is the fact that the jury in this case found premeditation but was not persuaded beyond a reasonable doubt that Robinson was the shooter. As noted, in connection with the count 1 murder conviction, the jury found "not true" the allegation that Robinson personally and intentionally discharged a firearm. And on the count 2 firearm possession charge, the jurors did not find Robinson possessed a handgun, although they found he possessed an assault rifle.[18]

As to direct aiding and abetting, we initially note that, while the instructions made this theory available to the jury, the prosecutor did not stress it as a basis for convicting Robinson. Instead, as discussed, the prosecutor argued Robinson was the shooter and discussed direct aiding and abetting principles primarily as a basis for establishing Pree was guilty of murder.

In light of the record and the prosecution's theories, we cannot conclude that a reasonable jury could *only* find that all elements of direct aiding and abetting liability were established as to Robinson. This is particularly so because there are no findings establishing the identity of the perpetrator (the jury having found "not true," as to both Robinson and Pree, that they

---

[18] As the Attorney General notes, and as Robinson acknowledges in his reply brief, the jurors' findings on gun use and possession are not affirmative findings that Robinson was *not* the actual killer. (*People v. Santamaria* (1994) 8 Cal.4th 903, 919 [not true finding on knife-use allegation "shows only that there was a reasonable doubt in the minds of the jurors that defendant specifically used a knife. *It does not show the reverse, that the jury specifically found defendant was an aider and abettor.*"].) But the jurors' findings do reflect their inability to conclude beyond a reasonable doubt that Robinson was the shooter.

discharged a firearm). In this circumstance, it is even more difficult to conclude that a reasonable jury could only find Robinson aided or encouraged the perpetrator and knew of the perpetrator's intent. (See *Lopez*, *supra*, 14 Cal.5th at pp. 587-588 [elements of direct aiding and abetting liability]; CALCRIM No. 401 [same].)

There was, of course, evidence that could have supported a conclusion Robinson directly aided or encouraged the murder of Ely. Witnesses testified that Robinson was present at the apartment complex on the day of the shooting and possessed a gun. His cell phone was near the complex. Late in the evening on the day of the shooting, he sent a text to Williams with an article about the shooting.

But as the Supreme Court explained in *Lopez*, "The question here is not the sufficiency of the evidence to support a valid theory, but its opposite. To determine the sufficiency of the evidence, a reviewing court essentially asks whether any rational juror could have made the findings necessary to convict the defendant on a valid theory. To determine harmlessness under *Aledamat*, a reviewing court essentially asks whether any rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had reasonable doubt regarding the findings necessary to convict the defendant on a valid theory." (*Lopez*, *supra*, 14 Cal.5th at p. 591; accord, *Ferrell*, *supra*, 14 Cal.5th at pp. 604-605 ["Given the standard of review for alternative-theory error, we do not view the evidence supporting the valid theory in the light most favorable to the prosecution, but instead consider whether a reasonable jury, given the findings actually made and the state of the evidence, could have found in favor of the defendant."].)

In our view, as discussed, a rational juror who found premeditation could have had a reasonable doubt as to the other elements of the valid

theories presented here, such as which acts Robinson did or did not commit and whether they amounted to direct aiding and abetting of murder. Because a reasonable jury could have reached a different verdict in the absence of the erroneous natural and probable consequences instruction, we cannot affirm Robinson's murder conviction by looking to the evidence on this record. (See *Ferrell, supra,* 14 Cal.5th at p. 608 ["Because a rational fact finder, consistent with a finding under Penal Code section 12022.53, subdivision (d), could have rejected malice and rendered a different verdict but for the erroneous felony murder instructions, Ferrell's second degree murder conviction cannot be affirmed by looking to the evidence."].)

For the foregoing reasons, we will reverse Robinson's first degree murder conviction. As we explained in part II.A.6, *ante*, "the prosecution is entitled to retry him on that charge if it can in good faith advance a valid legal theory to support the conviction." (*People v. Hola, supra,* 77 Cal.App.5th at p. 377, italics omitted.)

Because we are reversing the defendants' murder convictions for instructional error, their other appellate challenges to those convictions are moot—including contentions about their ability to (1) present third party culpability evidence as to the murder, (2) impeach witnesses who testified about the shooting, and (3) obtain juvenile records for those witnesses. We shall address below only the arguments that affect the defendants' firearm possession convictions or enhancements associated with those convictions.

### C. *The Gang Enhancements*
#### 1. Background and the Parties' Arguments
For both defendants, and as to both the murder and firearm possession charges, the jury found true allegations that the offenses were committed in association with a criminal street gang (Kumi) under section 186.22, subdivision (b). That statute provides for enhanced punishment for "a person

35

who is convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1); *id.*, subd. (b)(4)–(5).)

In his initial opening brief, Pree challenged the admission of certain telephone conversations and video evidence to prove the gang enhancements. In a supplemental opening brief, he argued that, due to ameliorative changes to section 186.22 effected by Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), the gang enhancements must be reversed. Robinson joined in both arguments.

The Attorney General agrees that Assembly Bill 333's amendments require reversal of the gang enhancements for both defendants. As to Pree's evidentiary challenge, the Attorney General contends there was no prejudicial error, but he also notes the question is moot because the enhancements must be reversed in light of Assembly Bill 333. In reply, Pree agrees the evidentiary issue is moot.

We agree with the parties and will vacate the enhancement findings pursuant to Assembly Bill 333's amendments to section 186.22.[19] We need not address Pree's challenge to the admission of allegedly prejudicial evidence to prove the enhancements.

**2. Assembly Bill 333**

Effective January 1, 2022, Assembly Bill 333 "amends section 186.22 to require proof of additional elements to establish a gang enhancement." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343.) Because Pree's and

---

[19] The gang enhancements associated with the defendants' murder convictions must be vacated in any event, as a result of the reversal of those convictions.

36

Robinson's convictions are not final, they are entitled to retroactive application of these ameliorative changes to section 186.22. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206–1207 (*Tran*); *People v. Lopez*, at p. 344.)

Assembly Bill 333's amendments include a narrowing of the definition of " 'criminal street gang' " in section 186.22, subdivision (f). (*Tran*, *supra*, 13 Cal.5th at p. 1206; *People v. Lopez*, *supra*, 73 Cal.App.5th at p. 344.) That phrase is now defined to mean "an ongoing, *organized* association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added, as amended by Stats. 2021, ch. 699, § 4.)

Assembly Bill 333 also "altered the requirements for proving the 'pattern of criminal gang activity' necessary to establish the existence of a criminal street gang." (*People v. Lopez*, *supra*, 73 Cal.App.5th at p. 345.) Prior to Assembly Bill 333, section 186.22, former subdivision (e) defined " 'pattern of criminal gang activity' " to mean "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (§ 186.22, former subd. (e), as amended by Stats. 2017, ch. 561, § 179.)

The new legislation added several requirements applicable to the predicate offenses that must be proven to establish a "pattern of criminal

37

gang activity": (1) the last predicate offense must have occurred within three years of the date of the currently charged offense; (2) the offenses were committed on separate occasions or by two or more gang members, as opposed to persons; (3) the offenses must have "commonly benefited a criminal street gang" where the "common benefit . . . is more than reputational"; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1)–(2), as amended by Stats. 2021, ch. 699, § 4; *Tran, supra,* 13 Cal.5th at p. 1206; *People v. Lopez, supra,* 73 Cal.App.5th at p. 345.)[20]

### 3. The Gang Enhancements Must Be Reversed

Here, the evidence and instructions at trial did not comport with the new requirements in section 186.22 as amended. The prosecution presented evidence of predicate offenses by Kumi gang members that occurred in 2007 and 2011. None of these offenses occurred "within three years of the date the current offense is alleged to have been committed." (§ 186.22, subd. (e)(1).) In addition, the jury was instructed it could rely on the current offenses in determining whether a pattern of criminal gang activity had been proven.

---

[20] Section 186.22, subdivision (e)(1) now states that " 'pattern of criminal gang activity' " means "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit from the offenses is more than reputational."
Subdivision (e)(2) states: "The currently charged offense shall not be used to establish the pattern of criminal gang activity."

"When a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error." (*Tran, supra,* 13 Cal.5th at p. 1207.) Here, the Attorney General concedes reversal is required, and we agree. Because the predicate offenses alleged by the prosecution did not satisfy the timeframe requirement imposed by the amended statute, the jurors could not have found the gang enhancement allegation true if they had been instructed about that new requirement and the new rule that the charged offenses may not be considered. The error requires reversal.[21]

In his supplemental opening brief addressing the gang enhancements, Pree suggested briefly that a reversal for failure to meet the requirements of current law "works the equivalent of an acquittal, [so] [he] cannot be retried on the gang enhancements." The Attorney General responds that retrial is permitted in these circumstances (where reversal is required based on a change in the law), and Pree does not address the point in his reply brief (stating only that he accepts the Attorney General's concession that reversal is required).

We agree with the Attorney General that retrial is permitted. (*People v. Sek* (2022) 74 Cal.App.5th 657, 669 [gang enhancement may be retried

---

[21] Since we are vacating the enhancement findings on the grounds stated in the text, we need not consider Pree's arguments that (1) the proof at trial was inconsistent with the revised statute in other respects, and (2) the evidence used to establish the predicate offenses was inconsistent with the restrictions on hearsay evidence outlined by our Supreme Court in *People v. Valencia* (2021) 11 Cal.5th 818.

after remand under Assembly Bill 333; " 'Because we do not reverse based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial. [Citations.] " 'Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence.' " ' "]; accord, *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1033 [remanding to allow People to prove applicability of gang enhancements under § 186.22 as amended]; *People v. Lopez, supra*, 73 Cal.App.5th at p. 346 [same].)

### D. *The* Batson/Wheeler *Motion*

Robinson contends the prosecutor violated his right to equal protection and to a jury drawn from a fair cross-section of the community by using a peremptory challenge to dismiss a black prospective juror. (*Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).) The trial court denied Robinson's *Batson/Wheeler* motion, finding the prosecutor's stated reasons for exercising the peremptory challenge were genuine and race-neutral.[22] We find no error.

### 1. Background

During jury selection, the prosecutor exercised a peremptory challenge to excuse Prospective Juror No. 100 (Juror 100), a black woman. Robinson's counsel objected, and the court then held a hearing in chambers. After

---

[22] In his appellate briefs, Pree states he joins in Robinson's appellate contentions. The Attorney General responds that Pree forfeited any *Batson/Wheeler* claim because, in the trial court, he did not expressly join in Robinson's *Batson/Wheeler* motion. Because we conclude the court properly denied Robinson's motion, we need not determine whether Pree adequately preserved his ability to pursue this issue on appeal.

hearing argument on the question whether a prima facie case had been established, and after noting each side had previously dismissed one black male juror (which apparently left two black women on the panel at that time, including Juror 100), the court found a prima facie case and asked the prosecutor to explain his reasons for challenging Juror 100.

The prosecutor gave four reasons for his challenge, relying in part on questionnaire and voir dire responses by Juror 100 that we discuss further in part II.D.3., *post*. The prosecutor stated he challenged the juror because (1) she had a lack of "community ties" and gave uninformative or "apathetic" responses about the other people living in her household, (2) she appeared to have some difficulty with, or reluctance to apply, certain legal concepts, including vicarious liability (under aiding and abetting and conspiracy doctrines) and direct and circumstantial evidence, (3) she indicated a willingness to lie to the police, as reflected in a response she gave during voir dire about a traffic ticket, and (4) she had "green in the hair," indicating "counterculture habits," "not something that I would tend to put on a case, especially one involving charges of gang murder."

In response, Robinson's counsel argued the prosecutor had not provided a satisfactory race-neutral explanation for dismissing Juror 100. Robinson's counsel stated the prosecutor mischaracterized the juror's response about the ticket; the juror stated she could follow the law; the prosecutor did not follow up on the juror's responses about the people in her household; and a different juror with blond streaks in her hair was not dismissed.

In rebuttal, the prosecutor stated other jurors had been dismissed for reasons similar to those he had stated for Juror 100. He also reiterated his assessment that the juror's responses indicated a willingness to lie to the police. The prosecutor stated: "[E]ach and every one of those issues I had

41

with [Juror 100] had nothing to do with her race and had everything to do with the way she answered the questions."

The court denied the *Batson*/*Wheeler* motion, accepting the prosecutor's reasons for the challenge. The court stated that "some of the reasons that have been proffered have been recognized already by the appellate courts as group-neutral reasons. One of those has been her unconventional hair, you know, her hair being having the green dye in it, certainly, would be one that has been recognized by the appellate courts. Another certainly would be her contact—prior contact with police and the information that she had given surrounding the traffic ticket, as well as the responses that she gave about the gangs and gang membership."

The court continued: "The other reason—and it was not—actually, I think one it has been recognized by the appellate court as well and that was the community ties that she has or lack thereof. The questions about, you know, where she resides versus where she gets her mail, but also the people, her lack of knowledge and information about the people with whom she resides and does kind of add questions about her community ties, especially as related to her significant other and other adults that lived in the household. She had no idea what they did, so that's—those are all the reasons."

### 2. Legal Standards

"Both the United States and California Constitutions prohibit the exercise of peremptory strikes on the basis of race or ethnicity. (*Batson*, *supra*, 476 U.S. at p. 89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276–277.) We follow a familiar three-step process in evaluating a defendant's *Batson*/*Wheeler* motion. First, the defendant must make a prima facie case by showing facts sufficient to support an inference of discriminatory purpose. [Citation.] Second, if the defendant makes a prima facie showing, the burden

shifts to the prosecutor to offer a permissible, nondiscriminatory explanation for the strike. [Citation.] Third, if the prosecutor offers a nondiscriminatory explanation, the trial court must decide whether that explanation is genuine, or whether impermissible discrimination in fact motivated the strike." (*People v. Battle* (2021) 11 Cal.5th 749, 772.)

Here, after finding a prima facie showing had been made, the court proceeded to the second and third stages of the *Batson/Wheeler* framework. Robinson challenges the court's ultimate denial of his motion at the third step.[23] "At the third step of the *Batson/Wheeler* analysis, the trial court evaluates the credibility of the prosecutor's neutral explanation. Credibility may be gauged by examining factors including but not limited to ' " 'the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " ' " (*Gutierrez, supra*, 2 Cal.5th at p. 1168.) "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613.)[24]

---

[23] Robinson notes a court may reject the stated reason for a strike at the second stage, but he does not develop an argument that the trial court should have done that here. We agree with the court that the prosecutor provided neutral reasons for the challenge as required at the second stage. (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1168 (*Gutierrez*) [at second stage, the " ' "issue is the facial validity of the prosecutor's explanation" ' "].)

[24] In a supplemental brief, Robinson argues that this court, in reviewing the trial court's ruling, should consider the intent of the Legislature in enacting Code of Civil Procedure section 231.7, which significantly modifies the *Batson/Wheeler* framework and, among other things, provides that some reasons for striking a juror are presumptively invalid. (Code Civ. Proc., § 231.7, subd. (e); *People v. Silas* (2021)

43

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions." (*People v. Lenix, supra,* 44 Cal.4th at p. 613.) "Reviewing the trial court's determination [that a stated reason for a strike is genuine] with restraint does not, however, mean abdication." (*People v. Hardy* (2018) 5 Cal.5th 56, 76.) Usually, such rulings "are entitled to deference only when the [trial] court made a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.' " (*Gutierrez, supra,* 2 Cal.5th at p. 1159.) Our Supreme Court has explained: "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (*People v. Silva* (2001) 25 Cal.4th 345, 386.)

The court has also stated, however, that " 'a trial court is not required "to make explicit and detailed findings for the record in every instance in which the court determines to credit a prosecutor's demeanor-based reasons for exercising a peremptory challenge." ' " (*People v. Hardy, supra,* 5 Cal.5th at pp. 76–77.) " 'Some neutral reasons for a challenge are sufficiently self-evident, if honestly held, such that they require little additional explication. . . . Moreover, a peremptory challenge may be based on a broad range of factors indicative of juror partiality, even those which are " 'apparently

68 Cal.App.5th 1057, 1069, fn. 12.) But the statute (enacted in 2020 by Assembly Bill No. 3070 (2019–2020 Reg. Sess.)) "has no bearing on this appeal" (*People v. Silas,* at p. 1069, fn. 12), because it applies prospectively to trials "in which jury selection begins on or after January 1, 2022." (Code Civ. Proc., § 231.7, subd. (i).)

trivial' " or " 'highly speculative.' " [Citation.] Yet when it is not self-evident why an advocate would harbor a concern, the question of whether a neutral explanation is genuine and made in good faith becomes more pressing.' " (*Id.* at p. 77.)

### 3. Analysis

For reasons we discuss further below, we conclude the trial court did not err by accepting the prosecutor's reasons for his peremptory challenge of Juror 100. Robinson argues that the court did not make a " 'sincere and reasoned effort to evaluate' " the prosecutor's reasons (*Gutierrez, supra,* 2 Cal.5th at p. 1159) and that those reasons were unsupported by the record or otherwise defective. We disagree and conclude the reasons given were generally supported by the record, not inherently implausible, and in some cases self-evident. (*People v. Hardy, supra,* 5 Cal.5th at pp. 76–77, 79.) The court invited and considered a responsive argument by defense counsel. And in making its ruling, the court (although not going into great detail) reviewed the prosecutor's reasons, in some cases stating its own view that those reasons were supported by the record. We find no basis to disturb the court's ruling accepting the prosecutor's reasons for the strike.

### a. *Lack of Community Ties and Apathetic Responses*

On her juror questionnaire, Juror 100, in response to a question about which city she lived in, wrote that she was "currently laying [her] head down in Antioch," and that her "[m]ail goes to Oakley." When the court asked during voir dire whether there were other adults living in her household, Juror 100 stated, "In the place I'm staying right now, yeah, my boyfriend and his cousin and his girlfriend." When asked what the other members of her household did for a living, she said her boyfriend did "[n]othing." The court asked, "What did he used to do before he was doing nothing?" The juror responded, "Nothing." The court then asked, "Before he was doing nothing,

45

was he doing something?" The juror stated, "No, not really, no. I mean, he had a little security job in Richmond, but that was about it."

The juror said her boyfriend's cousin was a rapper. When asked about the cousin's girlfriend's job, the juror said, "I don't exactly know," and "She travels a lot." "Whatever she does, it involves traveling somewhere. I never really asked. I should probably ask, but I never really asked."

When explaining his decision to challenge Juror 100, the prosecutor noted these responses, stating the juror "has [no] community ties," and her inability to provide much information about the people living in her household reflected "an apathetic approach to what is a very serious process." As the Attorney General notes, such characteristics as the lack of a stable address and a perceived "apathetic" approach to the jury selection process are plausible and race-neutral reasons to excuse a juror. (See *People v. Lomax* (2010) 49 Cal.4th 530, 575 ["it is not unreasonable for a prosecutor to believe a young person with few ties to the community might be less willing than an older, more permanent resident to impose a substantial penalty"]; *People v. DeHoyos* (2013) 57 Cal.4th 79, 105 ["A failure of a juror to appreciate the gravity of his or her responsibility in a capital case may be an adequate race-neutral basis for a peremptory challenge"].)

Robinson contends the prosecutor's failure to ask Juror 100 about her living situation during voir dire indicates his stated concern about that issue was not genuine. (See *Miller-El v. Dretke* (2005) 545 U.S. 231, 246 [failure to engage in voir dire on a subject can be evidence that the prosecutor's later reliance on the matter to explain a peremptory strike is pretextual].) But here, as the Attorney General notes, the court had questioned the juror and elicited the responses that the prosecutor perceived to be "apathetic." Moreover, the trial court could consider the extent of voir dire questioning,

46

along with all other relevant circumstances, in assessing the credibility of the prosecutor's explanation.

Robinson also argues the juror *did* have "substantial ties" to the community, because "[s]he lived in Antioch with her boyfriend, she worked in Pittsburg, she . . . graduated from high school, in Oakley, and receives her mail in Oakley, probably at her parent's house." As the Attorney General notes, the suggestion the juror received her mail at her parent's house is speculation. And the facts in the record about where the juror lived and went to school did not contradict the prosecutor's stated concerns about the juror's lack of a settled residence and her apathetic answers to the court's questions. Finally, in our view, Robinson's assertion that the juror did know *some* information about the other people in her household (which he argues is in conflict with the prosecutor's and the court's brief statements that she lacked such information) does not establish that the prosecutor's explanation for the strike (the juror's perceived apathetic approach) is contrary to the record, and does not undercut the court's decision to credit the sincerity of that explanation.

b. *Green Dye in Hair*

Juror 100's green-dyed hair was also a race-neutral reason to excuse her. (See *Wheeler, supra,* 22 Cal.3d at p. 275 [noting a prosecutor may fear a juror will be biased "simply because his clothes or hair length suggest an unconventional life-style"]; see also *Purkett v. Elem* (1995) 514 U.S. 765, 769 [prosecutor's explanation that he struck a juror "because he had long, unkempt hair, a mustache, and a beard—is race neutral"].) In the trial court, Robinson did not dispute Juror 100 had green dye in her hair.

Robinson argues the prosecutor did not question Juror 100 about whether her green hair "related to some Christmas celebration or maybe even a charitable event." As discussed, the court could consider the prosecutor's

47

lack of questioning as part of its evaluation of the prosecutor's proffered reasons.

Robinson also notes a different juror with streaks of blond hair was not challenged. We agree with the Attorney General that blond hair dye is "more mainstream" than green hair dye. Moreover, Robinson's trial counsel pointed out that the other juror had blond dye in her hair. The prosecutor also stated he had stricken a different juror who had what he deemed to be "counterculture hair." The court had the relevant information to assess the credibility of the prosecutor's explanation.

      c. *Difficulty with Legal Concepts*

During voir dire, the prosecutor asked Juror 100 if she would be able to find a person guilty as a direct perpetrator, an aider and abettor, or a coconspirator, "if it's proven under the law." The following exchange occurred:

"[Juror 100]: Kind of depends on how much they were involved, but . . .

"[The Prosecutor]: Well, can you help me understand. What do you mean by that, like, how involved they were?

"[Juror 100]: Well, I mean, obviously, a conspirator is somebody you were talking about the crime with. So I mean—but like that could be anybody. Can be like, Man, you know what, I really don't like this person. I think I'm going to take her charger. But then all of a sudden her charger comes up missing, but you didn't take it. But that person you were talking to, they'd also be blamed for her charging [*sic*] coming up missing?

"[The Prosecutor]: Well, you raise a good example. You'd have to be able to prove that the person actually took the charger in that example before anyone could be held responsible. You have to have a perpetrator, and then you back backwards from that.

"So did you have any issues with the example that I gave of the—could be a man or woman, doesn't matter—if he or she decided that they were going to do that bank robbery, they agreed to do it, but then they stayed home, hoping that they would get some cut of the money, the other four go out and they do the bank robbery; if it's shown that they were a coconspirator and don't have to prove a formal agreement, they don't have a text message that says, I hereby agree to commit bank robbery, but if it's shown that through their actions or their words that they were all involved in that incident, even if that person stays home, they would be responsible for the bank robbery.

"[Juror 100]: I would think that person's probably, like, the mastermind.

"[The Prosecutor]: Okay. But do you think in all scenarios you'd be okay with that, or would there be kind of like the charger example in your mind, would you have more difficulty with that person that stayed home?

"[Juror 100]: No. I'd be okay with it."

The prosecutor also questioned Juror 100 about direct and circumstantial evidence, and the following exchange occurred:

"[The Prosecutor]: So the person, basically, goes in [to Target], they have a bag that has tinfoil. You learn that tinfoil can defeat the sensors that are at the front door, when they have those tags on them to go back out. And then, basically, they go up to the clothing rack, they pull out some, basically, pliers or snippers of some sort, start ripping tags off the clothing, throw it in the bag, and then they run out the store. They run past the cash registers, don't make any attempt to pay and then they leave. Would you be able, without them saying anything, to conclude from their actions that they went into the store with the intent to steal?

"[Juror 100]: No, I can't say that they went in the store with the intent to steal, unless they actually started stealing something. Because I actually work retail with sensors and all that stuff. And I didn't even know that you could use foil to thwart that. If you come in and the doors are beeping, we just ask you not to come inside the store at all.

"[The Prosecutor]: Okay. So it wasn't helpful, though, in my example that the person actually takes out the pliers and actually rips the tags off the clothing?

"[Juror 100]: Yeah, if you see the person take out the pliers and rip the tags off, then, yeah, they're there to steal. But I mean, it's just constantly trying to address somebody as soon as they walk into the store and you can't really do that. It depends if it's the store's policy to check bags in behind the counter before they walk into the store. So would that necessarily be the store's problem if they come in with stuff that can take off the sensors?"

The prosecutor later cited these exchanges in explaining his peremptory challenge of Juror 100, stating, "she had an issue with the idea of holding somebody responsible under the coconspirator or aider and abettor, depending on the scenario, and that was something that gave me some concern." The prosecutor also stated that Juror 100 "had issues with my direct and circumstantial evidence example"; she initially did not recall it and "then had issues with the Target bag example." After the prosecutor explained the example, Juror 100 "still didn't commit that she would be okay in every circumstance."

We fail to see any reluctance to accept legal concepts in Juror 100's responses to the prosecutor's conspiracy and circumstantial evidence questions. The colloquy produced by these rather awkwardly phrased hypotheticals strikes us primarily as an example of failure to communicate—

with two people talking about different things—rather than reticence about the law on the part of Juror 100. But that is not evidence of pretext or lack of sincerity by the prosecutor. To the contrary, the confusion tends to suggest the prosecutor may have actually believed he was not getting satisfactory answers to the questions he thought he was asking.

Robinson argues Juror 100 affirmed on her questionnaire and in response to voir dire questions from the court that she would follow the law. But as the Attorney General notes, the prosecutor's stated concern was not with the juror's ultimate answers, but instead with the manner in which she responded, which was somewhat indirect and equivocal and sometimes involved the injection of personal information. On this record, the court reasonably could conclude that the prosecutor's explanation on this point was sincere and not pretextual.

Robinson also contends that the trial court, in ruling on the *Batson*/*Wheeler* motion, misdescribed one aspect of the prosecutor's explanation of his reasons for striking Juror 100. The court referred to "the responses that [Juror 100] gave about the gangs and gang membership," while the prosecutor had stated that some of Juror 100's responses about being truthful with the police would "present problems" for the People, "as it would relate to judging the credibility of witnesses, the specific issues in this case and, also, specifically, when we have very many witnesses in a gang case who may lie to the police." In our view, on this record, the court's brief apparent misstatement does not undercut the soundness of its decision to accept as credible the prosecutor's stated reasons for challenging the juror.

    d. *Willingness To Lie to the Police*

During voir dire, Robinson's counsel had the following exchange with Juror 100:

"[Robinson's counsel]:  And regarding the different statements— regarding the different statements that the district attorney has said about a statement that's made to police versus a statement that's made to the Judge, while testifying under oath, there's not a higher credence to a statement that's made before versus a statement made here in court.

"Does everyone understand that?

"Both statements are weighed equally, but it's up to you to decide how much weight to give it.  Does everyone understand that?

"Can you think of motivations, [Juror 100], of why someone would make a statement that's untrue to the police?

"[Juror 100]:  It's always good to be honest.  But I've had my fair share of having to tell, oh, no, that's not true; but I end up with a ticket anyway. So the—it's just like, me, I prefer just not to argue.  I'd just be, like, okay, you say what you say; if that means you're going to put that on me, then fine.

When the prosecutor later explained his decision to challenge Juror 100, he referred back to the above exchange, stating:  "The other issue, and I think the most glaring issue was, as it related to the discussion with, I believe it was [Robinson's counsel], where she indicated that she actually had herself to lie to the police or to indicate that a lack of involvement in something and she indicated that she still received tickets.  And that was something that had never been disclosed in the questionnaire, and that caused me the biggest concern as it related to some of the answers that she gave on her questionnaire."  As the Attorney General notes, a juror's apparent willingness to lie to the police and failure to reveal police contacts is a race-neutral reason to excuse her. (See *People v. Winbush* (2017) 2 Cal.5th 402, 441 ["the juror's failure to disclose his arrest in the questionnaire could reflect a lack of candor, a legitimate concern for the prosecutor"].)

52

Robinson argues this reason given by the prosecutor was not supported by the record. Specifically, Robinson contends Juror 100 did not state she was willing to lie to the police, and that, instead, the "essence of her statement was that there is really no fighting city hall." This argument does not persuade us the trial court erred in accepting the prosecutor's explanation as genuine. In our view, the juror's comments, while perhaps ambiguous and open to the interpretation suggested by Robinson, could also reasonably be construed in the manner articulated by the prosecutor, i.e., that the juror had not reported dealing with police in traffic stops, and as a way to avoid being ticketed in those encounters, had denied engaging in conduct she knew she had engaged in.

In his reply brief, Robinson also argues the juror did not provide an inaccurate response on the questionnaire. The questionnaire asked whether the responding juror had ever been "a victim of, witness to, or accused of (including arrested, charged, went to trial, or incarcerated in any jail), any crime?" (Emphasis removed.) Juror 100 answered, "No."

Robinson contends this question did not ask the jurors to reveal all police contacts and that most jurors would not consider a traffic violation resulting in a ticket to be a crime. But, again, we do not think this argument shows the court erred in accepting the prosecutor's stated reason as genuine. The juror's failure to disclose police contacts on the questionnaire (even accepting there may be different interpretations of the question at issue), as well as her comments suggesting (although, again, not without ambiguity) that she had made misstatements to police, had sufficient support in the record that the court was entitled to accept as genuine the prosecutor's statement that these matters caused him concern and were among the reasons for his strike.

Finally, Robinson suggests briefly that prior discrimination in jury selection by attorneys from the Contra Costa County District Attorney's Office was relevant to the Batson/Wheeler motion. But he does not suggest he raised this issue in the trial court, and he does not develop a specific argument about how past discrimination should have affected the court's evaluation of the reasons provided by the prosecutor in the present case. We find no error.

### E. *Sufficiency of the Evidence To Support Robinson's Conviction on Count 2*

Robinson contends the evidence was insufficient to support his count 2 conviction of firearm possession by a felon (§ 29800, subd. (a)(1)). The jury found him guilty of possessing an assault style rifle, an " 'AR,' " between September 1 and September 6, 2015.[25]

### 1. Legal Standards

In considering a challenge to the sufficiency of the evidence, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

Under section 29800, subdivision (a)(1), a person who has been convicted of a felony is prohibited from having a firearm in his or her possession or under his or her custody or control. A conviction under the statute may be based on either actual or constructive possession. (*People v.*

---

[25] Pree joins generally in Robinson's arguments. But Pree does not develop a sufficiency of the evidence challenge to his own conviction of firearm possession by a felon, and Robinson's arguments on this point do not apply to Pree's firearm possession.

*Brimmer* (2014) 230 Cal.App.4th 782, 795.) " 'To establish constructive possession, the prosecution must prove a defendant knowingly exercised a right to control the prohibited item, either directly or through another person.' " (*Ibid.*)

"Possession may be shared with others." (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1417, disapproved on other grounds.) "[M]ere proximity to the weapon, standing alone, is not sufficient evidence of possession." (*Ibid.*) But " 'possession may be imputed when the contraband is found in a place which is immediately and exclusively accessible to the accused and subject to his dominion and control, or to the joint dominion and control of the accused and another. [Citation.] [¶] The elements of unlawful possession may be established by circumstantial evidence and any reasonable inferences drawn from such evidence.' " (*People v. Busch* (2010) 187 Cal.App.4th 150, 162.)

### 2. Analysis

Here, the evidence was sufficient to permit the jury to infer Robinson actually or constructively possessed an AR-style rifle as charged in count 2.

During the search of the Fieldstone house, officers found an AR-style rifle under the bed in the master bedroom. Pree had a photograph on his phone that depicted an AR-15 similar to the one recovered at the house. At the time of the house search, Michelle Wakefield, who was living at the house with Freeman Williams, told Detective Lowther that she had seen Robinson at the house, and that she believed she saw the end of a large black gun sticking out of a bag in the master bedroom that she believed belonged to Robinson.

Twonesha Wood told the police that she saw "OG" and "Will" near Will's car prior to the shooting. Although Wood said she saw OG with an assault rifle and Will with a pistol, she later clarified that Will had the

55

assault rifle and OG had the pistol. At trial, Wood testified that about an hour and a half before the murder, she saw several "older cats" around a car that had backed into the parking lot. They all had guns, and somebody put a "rifle" or "machine gun" that could have been an "AR"-style rifle in the trunk.

Based on this evidence, the jury reasonably could have concluded Robinson was in physical possession of a rifle when he was staying at the Fieldstone house. Additionally, based on the evidence of Pree's and Robinson's joint involvement in the murder of Ely, the jury reasonably could conclude that Robinson and Pree were in joint possession of the rifle in the trunk of Pree's car on the day of the murder. There was sufficient evidence Robinson actually or constructively possessed an "AR" rifle between September 1, 2015, and the day of the murder, September 6, 2015.

In his reply brief, Robinson argues Detective Lowther's testimony about Wakefield's statements as to the timing of Robinson's visits to the Fieldstone house was based on a "mistake," i.e., apparent confusion as to whether Robinson visited the house before the murder or before the search. But the jurors heard Robinson's trial counsel's cross-examination of Lowther on this point, and they could give his testimony the weight they deemed appropriate in light of any discrepancies. The jurors were entitled to credit Lowther's testimony that Wakefield stated she believed she saw a gun sticking out of Robinson's bag.

Robinson also argues Wakefield testified at trial that she did not see a gun in the bag, but her testimony was not that definitive. She stated on cross-examination that she did not know whether the object was a gun, agreeing that she had previously told the prosecutor that "it might have been a gun, it might not have been." In any event, the jury, after considering any

inconsistencies with Wakefield's trial testimony, could credit Detective Lowther's account of her initial statement that she saw a gun.

Robinson similarly points out Wood's trial testimony was more equivocal than what she initially told police. For example, at trial, instead of identifying "OG" and "Will," Wood testified that there were several "older cats" by the car and that she did not know Pree or Robinson. She also was not definitive as to what type of rifle was placed in the trunk, although she agreed it could have been an "AR." But as with Wakefield's testimony, the jury could credit Wood's earlier statements to police and the portions of her trial testimony that were consistent with those statements.

Because we conclude the evidence outlined above is sufficient to support the conclusion Robinson actually or constructively possessed an AR as charged in count 2, we need not address the parties' arguments as to whether expert testimony about gang members' access to "gang guns" would itself support a conclusion that Robinson, as a Kumi gang member, constructively possessed the AR found at the Fieldstone house. (See *People v. Sifuentes*, *supra*, 195 Cal.App.4th at pp. 1417–1418 [expert testimony that gang members have access to gang guns (but with unspecified restrictions) did not show defendant had the right to control a gun possessed by another gang member].)

F. *The Jury Instructions on Count 2*

Robinson contends the court did not adequately instruct the jurors that, to convict him of possessing an assault-style rifle as charged in count 2, they had to agree unanimously as to which act constituted the unlawful possession.[26] We conclude there was no instructional error.

---

[26] As noted, Pree joins generally in Robinson's claims of error. But he does not develop a challenge to the instructions as they pertain to his alleged

"In a criminal case, a jury verdict must be unanimous. [Citations.] . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) Specifically, where the defendant is charged with one count of firearm possession but the jury could find possession of multiple firearms (and the possession of those firearms was "fragmented" as to time or space), the court must instruct the jury that it must unanimously agree on which firearm the defendant possessed. (*People v. Wolfe* (2003) 114 Cal.App.4th 177, 185.)

The court's instructions complied with these requirements. The prosecution alleged in count 2 that Robinson possessed a Glock handgun and an assault-style rifle, an AR. The court's instruction on count 2—based on CALCRIM No. 2511—noted these allegations and stated the jurors could only find Robinson guilty if they all agreed "*which firearm*" he possessed. (Italics added.) The instruction stated in relevant part:

"The People allege that the defendant owned[,] purchased[,] received[, or] possessed the following firearms: [¶] . . . [¶]

"Defendant Robinson:

"9/1/15–9/6/15–handgun 'Glock'

"9/1/15–9/6/15–Assault Style Rifle 'AR'

"You may not find the defendant guilty unless all of you agree that the People have proved that the defendant owned/purchased/received/possessed

---

acts of firearm possession, which differed from those alleged against Robinson.

58

at least one of the firearms, and you all agree on which firearm he owned/purchased/received/possessed."

In addition, the court instructed with a version of CALCRIM No. 3500 (a standard unanimity instruction), which specified the jurors had to agree on "*which act*" formed the basis for the count 2 conviction. (Italics added.) That instruction stated in relevant part:

"The defendant is charged with possession of a weapon in Count 2 sometime during the period of[:] [¶] . . . [¶]

"Defendant Robinson:

"9/1/15–9/6/15–handgun 'Glock'

"9/1/15–9/6/15–Assault Style Rifle 'AR'

"The People are not required to prove that the crime took place exactly on that day but only that it happened reasonably close to that day.

"The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."

These instructions informed the jurors that, to convict Robinson on count 2, they had to agree unanimously as to which firearm he possessed and which act or acts of possession occurred. Robinson contends, however, that in light of the evidence presented, these instructions were insufficient.

As discussed in part II.E., *ante*, there was evidence Robinson actually or constructively possessed an AR between September 1 and September 6, 2015—the testimony that there was an AR in the trunk of the getaway car, the testimony that Robinson had a gun sticking out of his bag at the Fieldstone house, and the inference that the AR found in the master bedroom

at the Fieldstone house was similar to the one possessed and photographed by Pree prior to the murder. Robinson argues the court's unanimity instructions were erroneous because, while they required unanimity as to whether Robinson possessed a handgun or an AR,[27] they did not adequately explain to the jurors that they had to agree unanimously as to which AR he possessed: the one in the bag seen by Wakefield, the one in the trunk of the getaway car, or the one found in the master bedroom of the Fieldstone house.

We find no error. To the extent the evidence suggested Robinson possessed more than one AR, the instructions required the jurors to agree unanimously as to which act of possession Robinson committed. Robinson's suggestion in his appellate brief that the court could have given a modified version of CALJIC No. 4.71.5 (pertaining to proof of specific acts within a specified period of time) or a modified version of CALCRIM No. 3502 (applicable when the prosecution elects a specific act as the basis of a charge) does not persuade us the court erred by giving the two instructions it gave, which, as noted, informed the jurors that unanimity was required both as to which firearm Robinson possessed and which act of possession he committed. We do not think it is reasonably likely the jurors interpreted the instructions (as Robinson suggests they could have done) to mean they could "mingl[e] evidence of multiple separate offenses" to support a conviction on count 2. (*People v. Burton* (2018) 29 Cal.App.5th 917, 925 [In assessing a claim that an instruction misled the jury, "[w]e must consider the instructions together as a whole, to determine whether it is reasonably likely a jury would interpret an instruction in a particular way, because we presume jurors understand and correlate all of the instructions."].)

---

[27] As noted, the jury found not true the allegation that Robinson possessed a handgun.

60

### G. *Pree's Motion To Suppress*

Pree contends the court erred by denying his motion to suppress evidence found on his cell phone. We conclude the court properly denied the motion.

#### 1. Background[28]

On September 8, 2015, Antioch Police Detective James Colley received information that Robinson was at 106 Fieldstone in Vallejo. Detective Colley contacted the United States Marshals Service and informed them that Robinson was a murder suspect, that he was on parole, and that he had an outstanding parole warrant.

Special Agent Baron Earl of the Department of Corrections Fugitive Apprehension Team was working with the Antioch Police Department to apprehend Robinson. Agent Earl and other task force members were surveilling the house at 106 Fieldstone. At some point, Robinson left the house along with an unidentified man and woman, and they got into a Cadillac and drove off. The other male was driving the car.

The agents followed the car until they visually confirmed that Robinson was the male passenger, seated in the back seat. Agent Earl contacted the San Pablo Police Department for assistance in initiating a vehicle stop.

Multiple marked vehicles from San Pablo Police Department initiated a stop of the Cadillac. San Pablo Police Officer Bryan Biama testified that when he turned on his lights and siren, he was aware that one person in the car being stopped was a murder suspect. He did not know whether there were weapons in the car or how many people were in the car.

---

[28] We recount here the evidence presented at the hearing on Pree's motion to suppress, some of which was also presented subsequently at trial (as outlined in pt. I.A.3., *ante*).

Initially, the Cadillac was traveling at a normal pace for the flow of traffic, but it accelerated and turned onto another street at a high speed. The car suddenly stopped, and the female passenger tried to exit the car quickly from the front passenger seat.

The officers conducted a " 'felony car stop' " where several police vehicles block all lanes of traffic and the officers "conduct an arrest and a search of each individual one-by-one at gunpoint."

The driver, Pree, was removed from the car first. He was searched and placed in the back seat of Officer Biama's car. The female passenger was searched and placed into another vehicle, and the back seat passenger, Robinson, was searched and placed in a third vehicle.

Officer Biama did not recall what specific items were removed during the search of each occupant, but he testified some standard items would have been removed. "In particular, phones and wallets. Wallets can conceal small object[s], like keys to get out of cuffs; and cell phones to prevent any communication until the scene is secure." Agent Earl recalled that cell phones were taken from the occupants. The property seized from each person would have been placed in the front seat or on the exterior of the patrol car in which the person was detained. Agent Earl estimated that three to four minutes elapsed between the time the car was stopped to the time everyone was patted down, separated, and placed in patrol cars.

After the occupants of the Cadillac were patsearched, handcuffed, and placed in patrol cars, dispatch informed the officers at the scene that Pree was on post-release community supervision (PRCS) and was searchable, and that Robinson was on parole and was searchable.

Robinson was arrested. Pree was removed from Officer Biama's car, and Robinson was placed inside. Officer Biama transported Robinson to the

San Pablo Police Department. Officer Biama assumed Pree was released from the scene because he never arrived at the police department. He estimated Pree would have been released between 15 to 30 minutes after the car stop, probably closer to 30. Agent Earl believed that Pree was released from the scene and that this occurred about 30 to 60 minutes after the initiation of the car stop. The Cadillac was searched and towed.

Detective Colley was notified that Robinson had been taken into custody at the San Pablo Police Department. Detective Colley picked up from a San Pablo police sergeant two cell phones that had been seized during the stop. Detective Colley knew one phone belonged to Robinson, but he did not know to whom the other phone belonged. While at the San Pablo police station, Detective Colley opened the phone to see if he could determine whose phone it was. He looked at a portion of the call log and may have opened the text messages, but he did not learn whose phone it was. Detective Colley did not know whose phone it was until Pree called the following day and asked for it back.

Due to his contact with Pree several months earlier, Detective Colley knew that Pree was on PRCS. Pree went to the Antioch police station to retrieve his phone. During an interview, Pree consented to a search and download of his phone. Prior to the interview, Officer Hewitt, at the request of Detective Colley, conducted a Cellebrite download of Pree's phone. Detective Colley told Officer Hewitt that Pree was on PRCS.

After hearing argument from counsel, the court denied Pree's motion to suppress the evidence found on his cell phone. The court found the circumstances surrounding the felony car stop justified the search of the car's occupants. The fact Pree was determined to be on PRCS also supported the validity of the search and seizure.

## 2. Analysis

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.) "Even if our reasoning differs from the trial court's, the trial court's ruling must be upheld if there is any basis in the record to sustain it." (*People v. Douglas* (2015) 240 Cal.App.4th 855, 860.)

We conclude the seizure of Pree's phone and the search of its contents were reasonable under the Fourth Amendment. First, we agree with the parties that the stop of the car and the temporary detention of Pree (and by extension his belongings) was justified based on the officers' reasonable suspicion that Robinson, a wanted murder suspect, was in the car. (*Arizona v. Johnson* (2009) 555 U.S. 323, 327.)

The patdown search of Pree was also justified. "To justify a patdown of the driver or a passenger during a traffic stop . . . the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." (*Arizona v. Johnson*, *supra*, 555 U.S. at p. 327.) As the Attorney General outlines, the officers were seeking to arrest Robinson, a murder suspect in a recent shooting. Pree was driving the suspect away from a home that was under surveillance for the suspect. Pree attempted to evade the officers by driving at a high speed, and the female passenger of the car attempted to flee. These circumstances supported a reasonable suspicion the occupants of the car were armed. During the patdown search, it was reasonable for the officers to seize Pree's phone as part of their effort to secure the scene, as well as to prevent its possible use as a weapon.

The retention and later search of Pree's phone were justified because the officers learned, during the car stop, that he was on PRCS. "[A]n individual who has been released from custody under PRCS is subject to search (and detention incident thereto) so long as the officer knows the individual is on PRCS. PRCS, like parole, involves the post-incarceration supervision of individuals whose crimes were serious enough to result in a prison sentence and thereby implicates important public safety concerns, as well as the state's ' " 'overwhelming' " ' interest in supervising released inmates." (*People v. Douglas*, *supra*, 240 Cal.App.4th at p. 865.) "As in the case of a parole search, an officer's knowledge that the individual is on PRCS is equivalent to knowledge that he or she is subject to a search condition." (*Ibid.*) Suspicionless searches of persons on PRCS, as with persons on parole, are permitted "so long as they are not conducted arbitrarily, capriciously, or for harassment." (*Id.* at p. 861; see *id.* at p. 863.) When Pree's phone was transported to the police station, the officers knew he was on PRCS. And when Detective Colley ordered the search of the phone using Cellebrite, he was aware of Pree's PRCS status.

We disagree with Pree's challenges to the validity of the search. He notes that, when the Cadillac was stopped, the officers at the scene were not aware of his PRCS status, and their later-acquired knowledge cannot justify the initial seizure of his phone as a PRCS search. But we do not hold (and the Attorney General does not argue) that the *initial seizure* of the phone was valid because of Pree's PRCS status. Instead, as discussed, the officers had a reasonable basis to stop the car to effect an arrest warrant for a potentially dangerous murder suspect, and they acted reasonably in patsearching the car's occupants and seizing (at least temporarily) objects such as phones that could jeopardize the security of the scene.

Pree next argues that, once the officers arrested Robinson, they had no basis to *retain* Pree's phone, even though they learned of his PRCS status while on the scene. He contends the retention of the phone and the subsequent search of its contents were arbitrary and capricious. We disagree. As discussed, once the officers learned of Pree's PRCS status, they had a valid basis to seize his phone (or in this case retain his phone, having already seized it) and search its contents. Contrary to Pree's assertion, it was not arbitrary or capricious for the officers to retain the phone and provide it to the detective investigating the murder, even though Pree was released. Although Pree was not yet a suspect in the murder, he was detained while driving a murder suspect away from a surveilled residence. He attempted to evade the police with the suspect in his car. In these circumstances, it was not arbitrary or capricious for the officers to retain his phone, allowing for it to be searched with technology not available at the scene to determine whether Pree might have assisted Robinson during or after the murder.

There is no basis for Pree's suggestion in his reply brief that the officers extended the traffic stop to conduct an investigation that was unrelated to the purpose of the stop. (Cf. *Rodriguez v. United States* (2015) 575 U.S. 348, 350–351.) After securing the scene, the officers checked whether the car's occupants had outstanding warrants and learned of Pree's PRCS status, which allowed their retention and search of the phone. (See *id.* at p. 355 [even in a routine traffic stop, officers may check for outstanding warrants against the driver].)

Finally, Pree argues that, when Detective Colley received the phone (and initially did not know whose it was), he should not have opened it and looked at the text messages. In connection with this argument, Pree contends again that, because the emergency at the scene had ended, the

phone should not have been retained and "was not lawfully in Colley's possession." Pree argues Detective Colley's actions, "tainted by the original illegal seizure of the cell phone, amounted to a further unlawful incursion under the Fourth Amendment."

We disagree. We have concluded the seizure and retention of the cell phone were valid, so Detective Colley's possession of it was not tainted by any previous Fourth Amendment violations. And Detective Colley's preliminary look at a properly seized phone (although he did not yet know whose it was) did not violate Pree's Fourth Amendment rights. As noted, the officers who retained the phone and took it to the police station knew of Pree's PRCS status. And even if more was needed before a full search of the phone was conducted, Detective Colley learned, before directing the download of the phone, that it belonged to Pree, who he knew was on PRCS. We reject Pree's argument that Detective Colley's actions were arbitrary and capricious. We find no Fourth Amendment violation.

### H. *The Sentences*

Pree and Robinson contend certain aspects of their sentences are erroneous or should be revisited due to changes in the law. In response, the Attorney General states that, because it is necessary to reverse the gang enhancements for both defendants and the murder conviction for Pree, the defendants must be resentenced. We agree, and as discussed above, we conclude it is necessary to reverse Robinson's murder conviction as well. We will vacate the sentences for both defendants and direct that they be resentenced after any retrial on the reversed portions of the judgment.

For the guidance of the trial court on remand, we note certain issues raised by the parties on appeal that may be relevant at resentencing. First, pursuant to legislation that took effect on January 1, 2019, the court will have discretion under section 1385 to strike any five-year enhancement for a

prior serious felony conviction that would otherwise be applicable under section 667, subdivision (a)(1).  (Stats. 2018, ch. 1013 (Sen. Bill No. 1393 (2017–2018 Reg. Sess.)),  §§ 1–2.)

Second, when the court imposed (for each defendant) a five-year enhancement under section 667, subdivision (a)(1), it erred by doubling the enhancement to 10 years under the three strikes law.  (*People v. Sasser* (2015) 61 Cal.4th 1, 12; *People v. Sok* (2010) 181 Cal.App.4th 88, 93–94 [in sentencing a second-strike defendant, the term for the current offense itself is doubled; "[h]owever, enhancements are added after the determination of the base term and are not doubled"].)

Third, the parties note issues relating to the court's application of the gang enhancements.  We are reversing those enhancements as stated in part II.C., *ante*, but we will comment on the issues raised by the parties, which could arise again if the enhancements are retried and found true.

The court stated at sentencing that the gang enhancement for each defendant was stayed.  Reflecting this statement, the abstract of judgment for each defendant's indeterminate sentence for murder in count 1 states that an enhancement under section 186.22, subdivision (b)(1)(A) was stayed.  This was incorrect.

"Penal Code section 186.22, subdivision (b) establishes alternative methods for punishing felons whose crimes were committed for the benefit of a criminal street gang."  (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004.) Section 186.22, subdivision (b)(1) provides that, "[e]xcept as provided in paragraphs (4) and (5)," a defendant who commits a felony for the benefit of a gang is to be punished by an additional term of imprisonment beyond that imposed for the felony itself.  The additional term for the enhancement varies depending on the nature of the felony committed—the enhancement term

68

ranges from two, three, or four years for many felonies (§ 186.22, subd. (b)(1)(A)) to five years for serious felonies (*id.*, subd. (b)(1)(B)) to 10 years for violent felonies (*id.*, subd. (b)(1)(C)).

But the enhancements in section 186.22, subdivision (b)(1)(A)–(C) do not apply where the felony is "punishable by imprisonment in the state prison for life." (§ 186.22, subd. (b)(5).) Instead, section 186.22, subdivision (b)(5) "applies and imposes a minimum term of 15 years before the defendant may be considered for parole." (*People v. Lopez, supra,* 34 Cal.4th at p. 1004.) First and second degree murder are punishable by imprisonment in the state prison for life (§ 190, subd. (a)), so they are not subject to the enhancements specified in section 186.22, subdivision (b)(1). (*People v. Lopez, supra,* 34 Cal.4th at p. 1004 [first degree murder is not subject to enhancement in § 186.22, subd. (b)(1)(C)]; *People v. Louie* (2012) 203 Cal.App.4th 388, 396 [" 'the gang enhancement under section 186.22, subdivision (b)(1) may not be imposed when subdivision (b)(4) or (b)(5) applies instead' "].) On the count 1 murder charge, rather than imposing and staying a section 186.22, subdivision (b)(1) enhancement, the court should not have imposed that enhancement.

The Attorney General notes, however, that, if the gang enhancement allegation is retried and found true on the count 2 firearm possession charge, an additional term of two, three, or four years is to be imposed (§ 186.22, subd. (b)(1)(A)), unless the court decides to strike that additional punishment and "specifies on the record and enters into the minutes the circumstances

indicating that the interests of justice would best be served by that disposition" (*id.*, subd. (h)).[29]

Finally, Pree contends a fee imposed by the court for preparation of a presentence report is improper under Assembly Bill No. 1869 (2019–2020 Reg. Sess.), which repealed section 1203.1b, effective July 1, 2021. (Stats. 2020, ch. 92, § 47.) At resentencing, the court may determine, for both defendants, which fines and fees may be imposed under current law.

### I. *Cumulative Prejudice*

Robinson (joined by Pree) argues multiple errors resulted in cumulative prejudice warranting reversal, with a focus on arguing Robinson's murder conviction must be reversed. We have concluded in parts II.A., II.B, and II.C., *ante*, that, in light of recent legislation, it is necessary to reverse (1) the gang enhancements for both defendants, and (2) the murder convictions for both defendants, as well as enhancements associated with those charges. As to the remaining claims that are not mooted by these determinations, we have found no error. There is no basis for reversal of other charges or enhancements.

### III. DISPOSITION

No. A152028: Pree's second degree murder conviction and Robinson's first degree murder conviction (count 1 for each defendant) and all enhancements associated with those counts are reversed. In addition, the gang enhancements are reversed as to both defendants and as to all counts of conviction. On remand, a new trial on any or all of these matters may proceed if the prosecution can in good faith advance a valid theory of

---

[29] At sentencing, the court did not separately address the gang enhancement for count 2 for either defendant, instead stating generally (without specifying a count of conviction) that the gang enhancement was stayed.

culpability.  After any retrial, both defendants shall be resentenced.  In all other respects the judgment is affirmed.

No. A160554:  Pree's appeal of the trial court's order denying his resentencing petition is dismissed.

STREETER, J.

WE CONCUR:

BROWN, P. J.
WHITMAN, J.*

---

* Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.